# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville July 27, 2010

## STATE OF TENNESSEE v. HENRY ALFRED HONEA

**Appeal from the Circuit Court for Coffee County**
**No. 33-839 L. Craig Johnson, Judge**

---

**No. M2009-01500-CCA-R3-CD - Filed January 28, 2011**

---

The Defendant, Henry Alfred Honea, was convicted by a Coffee County Circuit Court jury of first degree premeditated murder, first degree felony murder, especially aggravated robbery, especially aggravated kidnapping, aggravated burglary, evading arrest, and being a felon in possession of a handgun. The Defendant received an effective sentence of life without parole plus 153 years, which was to be served consecutively to previous sentences for other convictions. On appeal, the Defendant argues that (1) the evidence was insufficient to support his convictions of especially aggravated robbery, especially aggravated kidnapping, first degree felony murder, and first degree premeditated murder; (2) the trial court erred in admitting expert proof about the rate of decomposition of the victim's body; (3) he was deprived of due process and a fair trial by the admission of proof of the Defendant's pending rape charges; (4) the trial court erred in failing to give an alibi instruction; (5) the trial court erred in admitting underlying factual proof about the Defendant's prior kidnapping convictions at the sentencing hearing; (6) the trial court erred in entering judgments for both first degree felony murder and first degree premeditated murder, then merging the convictions; and (7) he was deprived of the effective assistance of counsel when trial counsel failed to call two exculpatory witnesses to testify at the trial. We affirm the especially aggravated robbery, especially aggravated kidnapping, aggravated burglary, evading arrest, and being a felon in possession of a handgun judgments. We vacate the first degree premeditated murder and felony murder judgments and remand the case for entry of one judgment of conviction for first degree murder, noting merger of the two counts of conviction.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in Part, Vacated in Part, Remanded

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

B. Campbell Smoot and Jess Sockwell (at trial), Tullahoma, Tennessee; and Joseph Ford (on appeal), Winchester, Tennessee, for the appellant, Henry Alfred Honea.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; C. Michael Layne, District Attorney General; and Felicia A. Walkup, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions arose from the kidnapping and murder of 92-year-old Flossie Barr and the burglary of her home. At the trial, Detective Frank Watkins of the Coffee County Sheriff's Department testified that on May 22, 2004, he and other officers were searching for the Defendant due to the Defendant's outstanding warrants. He said that the sheriff's department received a tip by telephone around 7:10 p.m. that the Defendant was driving a small black car with gray on the bottom toward Tullahoma. He said that he heard radio reports of other officers having seen the Defendant and that he and other officers searched in various locations. He said that he was with Chief Holt and Investigator Campbell when they passed the church the Defendant's father pastored and that he saw a car parked at the side of the church. He said that as he drove toward the car, another car came from behind the church and drove by him. He said that as the car passed, he noticed that the driver looked like the Defendant. He said that he was able to see the car as it passed the other officers and that it matched the description they had been given. He said that the Defendant drove slowly through the parking lot and that Investigator Campbell yelled that the person was the Defendant. He said that he and Chief Holt followed the Defendant onto South Roosevelt Street and that when they activated their blue lights and sirens, the Defendant accelerated and tried to flee. He said the Defendant ran a stop sign, made a hard turn, and ran another stop sign while he and Chief Holt pursued. He said that the Defendant failed to negotiate a curve and ran into a driveway and through a yard, barely missing a house. He stated that the Defendant jumped out of the moving car before it hit a fence and fled on foot. He said that Chief Holt, Investigator Campbell, and he chased the Defendant on foot and that Investigator Campbell ordered the Defendant to stop and stated that they were from the sheriff's office. He said that as he came into a wooded area, he saw the light of Investigator Campbell's flashlight and heard Investigator Campbell yelling for the Defendant "to put it down." He said that as he ran back toward the patrol cars to keep the Defendant from stealing one of the cars, the Defendant came out of the woods holding a pistol. He said that the Defendant made a motion toward Investigator Campbell and that he fired his gun twice because he feared the Defendant would shoot Investigator Campbell. He said the Defendant ran but then fell to the ground. He said he saw a pistol on the ground a few feet from the Defendant's head when the Defendant was struggling not to be handcuffed by Chief Holt and Investigator Campbell. He said the Defendant was shot in the right knee.

-2-

Detective Watkins testified that he learned after the Defendant's arrest that the Defendant was driving a car registered to the victim. He identified as an exhibit a weapon that he said was the one the Defendant carried. He identified photographs of the church where the officers first saw the Defendant, located at 1100 East Lincoln Street, and the victim's house, located at 1107 East Lincoln Street. While identifying photographs of the area covered during the chase, he said the Defendant put third persons at risk of death or injury. He said that the Defendant nearly struck two occupied homes and that he and Chief Holt nearly hit a house while chasing the Defendant. He said that a case of Budweiser beer, bottles, and personal belongings were found inside the car the Defendant drove.

Detective Watkins testified that he had been to the victim's home several times before May 22. He said he and other law enforcement officers had been there to reassure her that they would help her with things occurring at her home, which were unspecified at the trial. He said that the victim always invited him inside her home and that her home and car were "pretty neat and tidy" and that her car was always washed. He saw the victim take her car keys from her purse.

Detective Watkins testified that the victim was not at her home on the evening of May 22. He said the police checked with the victim's relatives, who said they had not spoken with or seen the victim in a few days. He said that the search for the victim extended outside Coffee County and that they focused on the area around "the pumping station," which the Defendant was known to frequent. He said that on May 26, a body was found at the pumping station.

Detective Watkins testified that he went to the pumping station and saw a female body. He said it was near power lines in an open area that had been used for four-wheeling. He said the body was covered with cut saplings. He said that the distance between the area where the body was found and the area where the victim's home and the church were located was between 7.2 and 7.4 miles, depending on the route traveled, and that it would take about fifteen minutes to travel the distance at normal driving speeds.

Detective Watkins identified a nine millimeter Taurus handgun as the one the Defendant had on May 22. He said the weapon did not have a clip in it when it was recovered but that a magazine and cartridges were found in the area of the foot pursuit of the Defendant. He also identified a bag of marijuana that the Defendant possessed when arrested.

Detective Watkins testified that there were several differences between the car when it was at the victim's house and when the Defendant was arrested. He said it had been a "tannish-brown" color but that it was spray painted flat black "more or less in a homemade

fashion." He said that the victim kept the car's interior "neat" but that it was in disarray on May 22.

On cross-examination, Detective Watkins admitted that the police looked for the Defendant for about two weeks for outstanding warrants unrelated to the victim's murder. He said that after receiving a "no contact" report about the victim, the Tullahoma police went to her home earlier in the day of May 22 and found her door open. He acknowledged that his car did not have a working siren on May 22. He said that when the Defendant came out of the woods during the foot pursuit, the Defendant was walking, not running. He acknowledged that the Defendant never fired his gun during the chase and arrest. He said that he did not personally recover the Defendant's gun but that he was able to identify it because he wrote down the serial number.

Detective Watkins testified that the victim called the police frequently and that he had been to her home approximately fifty to sixty times over a three to four-month period. He said she was concerned that people would break into her home and steal from her. He acknowledged that she was paranoid. He said that she was concerned about her neighbors but that she never mentioned the Defendant or any family members.

Bill Pamplin testified that the victim was his maternal aunt. He said that she was a ninety-two-year-old widow and that she had health problems. He said that he was her "go-to boy" before her death, that he tried to see or talk to her weekly, and that he took her to appointments and on errands. He said the victim was neat and orderly with her home and her car. He said that she would not loan her car to others and that she kept her car keys in her purse. He said that she kept her purse in her bedroom when it was not with her and that she kept the purses she was not using in her bedroom closet. He said he did not remember the victim ever leaving her keys on the coffee table. He identified a photograph depicting the victim's keys and said that the safety pin on one of the keys was the victim's "trademark" because she liked safety pins.

Mr. Pamplin testified that the victim was concerned about her safety. He said she kept her blinds closed after dark, locked her doors, and stuck screwdrivers in her doors because she thought they provided extra protection. He said that she made visitors identify themselves before she let them into her house. He said the victim would not have allowed anyone to spray paint her car.

On cross-examination, Mr. Pamplin acknowledged that he last saw the victim on May 9, 2004. He said that the victim appointed him executor in her will in 2003 and that she had seven grandchildren, all of whom lived in the Nashville area. He admitted that the victim made statements to him about her belief her grandson Joe was stealing money from her and

-4-

that it was after this that he was appointed executor.  He said he did not know whether Joe had the opportunity to steal money from the victim.  He admitted that the victim was paranoid about her neighbors stealing her food but said she never mentioned anyone by name.  He acknowledged that the victim never expressed concerns about the Defendant.

Judy Grealis testified that she was retired from Contact Lifeline, a service that called elderly or disabled people to provide friendship and reassurance.  She said that Contact Lifeline called the victim every day and that she was one of the people who called the victim.  She said she had been to the victim's home to take photographs one or two weeks before the victim's disappearance.  She said that Contact Lifeline kept photographs of the people called in order for its volunteers to know the people they were calling.  She said she was very impressed by the victim's perfect housekeeping and landscaping.  She said the victim's car looked "fine" but admitted she did not really notice it.  She identified a photograph she took of the victim a week or two before the victim's disappearance.  She said that the victim's home was spotless in the photograph and that there were no keys on the coffee table in the photograph.  She identified a photograph of the victim's yard, which she said was in excellent condition every time she saw it.  She identified another photograph depicting the flowers in the victim's yard and part of the victim's car.

Ms. Grealis testified that she last spoke with the victim on May 21, 2004, at about 3:30 p.m.  She said that she asked the victim if she could visit the next day to show her a photograph collage but that the victim said she did not feel well and did not want her to visit.  She said that she tried to reach the victim on May 22 at noon but that the victim did not answer her telephone.  She said that another call from Contact Lifeline was placed at 1:00 p.m. but that the victim did not answer.  She said she went to the victim's home around 4:00 p.m. and saw that the padlock the victim kept on her front door was missing, that a window was open, and that the victim's car was not there.  She said that she left because she felt uneasy and that she called Contact Lifeline to have a backup person check on the victim.

On cross-examination, Ms. Grealis acknowledged that although she drove by the victim's home about five times in the year before the victim's death, she only visited inside the victim's home once.  She also admitted she was not always the person from Contact Lifeline who called the victim.  She said that about a month before the victim disappeared, the victim expressed her concern that someone was stealing her food.  She acknowledged that she was not concerned the first time the victim did not answer her telephone on May 22 because the victim was sometimes away from home.

Sue Meks testified that she was the manager of Favorite Market on May 22, 2004.  She said the Defendant came to the store around 2:00 or 2:30 a.m. and bought a twelve-pack of Budweiser for "$10 and some change."  She described the Defendant as very calm.  She

said that as the Defendant drove away, she saw he was in a brown Ford or Mercury with metal racks on the back. She identified a photograph of the market and a cash register receipt for a twelve-pack of Budweiser for $10.34. She noted the time and date on the receipt as 2:14 a.m. on May 22, 2004. She identified a videotape from the market's cameras, which she said showed that the Defendant came to the store, bought beer, and left. She noted that the tape reflected a time of 2:16 a.m. when the Defendant took the beer from the cooler. The tape was played for the jury. Ms. Meks testified that she watched to be sure the Defendant was gone and then called the Communications Center and reported that the Defendant just left the store. She said she waited because, "I didn't want him to know that I knew anything."

On cross-examination, Ms. Meks acknowledged that the Defendant did not cause a disturbance in the store. She said he did not have any difficulty finding the beer or paying for it. She admitted he did not have noticable stains on his clothes. She acknowledged on redirect examination that she told the TBI in a previous statement that the Defendant looked intoxicated, tired, and unshaven. She said on recross-examination that the Defendant was uneasy, which made her uneasy, but that she called the police based on information she knew, not the Defendant's mannerism.

Tullahoma Police Officer Rana Pawlowski testified that before the victim's death, she responded to the victim's 9-1-1 calls reporting that someone was breaking into the victim's home. She said that after the victim called 9-1-1 several times, she trimmed the bushes near the victim's windows to prevent them from scraping the windows and frightening the victim. She said the victim kept a clean, organized home.

Officer Pawlowski testified that on May 22, 2004, she was dispatched by the Communications Center to check on the victim. She said that when she arrived at the victim's house about 8:40 p.m., the victim's car was not there. She said this was strange because the victim did not like to drive at night. She said the door was open and missing the padlock. She said that after Officer Blackburn came to assist her, they went into the victim's home and noticed the rug at the front door "wadded up," which she said was unusual given the victim's orderly nature. She said the toilet seat was up and there was urine but no tissue in the commode, which made her think a man had been there. She said that the victim's bedcovers were in disarray, that there were stains on the bedspread that looked like blood, and that the victim's purses were scattered about the room. She said that she notified the Communications Center and left the victim's home, locked the door as best she could, and began patrolling for the victim's car.

Officer Pawlowski testified that ten or fifteen minutes later, she responded to a call for assistance from other officers who were chasing the victim's car. She said that when she

saw the victim's car, it appeared to have hit a fence on property behind a curve in the road. She said she heard a couple of shots and saw the Defendant running around the side of a house a few minutes later. She said she ran parallel to the Defendant for twenty to twenty-five yards until he threw the gun and fell, after which he was captured. She said she stood over the gun until the investigators arrived to collect it.

On cross-examination, Officer Pawlowski testified that the victim was paranoid about her neighbors, believing they were stealing food and cooking in her house when she was not there. She said the victim never identified anyone by name and never complained about the Defendant. Officer Pawlowski acknowledged that she went to the victim's home ten to thirty times in the year before the victim's disappearance, usually because the victim thought someone was trying to break in to her home. She admitted she never found any evidence of an attempted entry.

Officer Pawlowski admitted that when the Defendant threw the gun and fell, the gun was not within his reach. She said that when she looked at the gun on the ground, it did not appear to have a magazine in it.

District Attorney's Investigator Billy Cook testified that he responded to the scene where the Defendant was shot and taken into custody. He said he took photographs, investigated the scene, and went to the victim's home. He said he knew something was wrong because the victim was missing and her car was spray painted.

Investigator Cook testified that he and Tullahoma Police Detective Ron Cunningham went to the hospital to question the Defendant about the victim's disappearance. He said the Defendant claimed that he helped the victim, whom he called "Granny," mow her yard on May 21, 2004. He said the Defendant stated that the victim allowed him to borrow her car and that she did not care that he spray painted it. He said the Defendant admitted being in the victim's home and sitting on the side of her bed while talking to her. He said the Defendant claimed to have last seen the victim at 3:00 or 4:00 p.m. on May 22. He said the Defendant denied killing the victim or hiding her body.

Investigator Cook testified that after interviewing the Defendant, he went to the victim's house and searched inside with other officers. He said that the rug by the front door was out of place, that the victim's bed was in disarray, that her purses were strewn across the bed, and that the purse's contents had been emptied onto the bed. He said that there was no evidence indicating the victim was killed in her home and that they secured the home in order to focus on searching for the victim's body elsewhere. He said the search continued until the early morning hours.

-7-

Investigator Cook testified that on May 23, 2004, he directed the crime scene investigation at the victim's house while other officers continued looking for the victim. He identified a diagram and photographs of the victim's home and testified about the configuration of the home. He said the victim's home and yard appeared to have been well maintained and that the yard appeared to have been recently mown.

Investigator Cook testified that a rag was left in the bathroom sink and that the victim's denture holder contained only her lower dentures. He said the stain on the victim's bedspread was later determined to have likely been from the victim's unhealed leg wound. He said that a garbage can was underneath a living room window and that the window's latch was broken and its screen cut. He said that inside the home, a sofa was underneath the window and that it appeared to have been stepped on because it had dirty spots and an indentation.

Investigator Cook testified that they did not find the victim despite extensive searches on May 24 and 25, 2004, and that he and TBI Agent Kendall Barham questioned the Defendant on May 25. He said the Defendant told them that he cut the screen of the victim's window and climbed in across the couch, that he found her keys on the coffee table, and that he left through the front door. He said the Defendant claimed not to know whether the victim was home. He said the Defendant recounted that he bought spray paint in Murfreesboro, that he painted the car, and that he searched for his father to gain permission to sleep in the church. He said that he implored the Defendant to do the right thing in order for the victim to have a proper burial, that the Defendant asked to have a cigarette first, and that the Defendant said, "Y'all [will] never be able to find her. I'll have to draw you a map." He said that the Defendant promised to draw the map if they would return the following day and requested the death penalty rather than spending the rest of his life in prison. He said he and Agent Barham signed a statement that they would recommend the death penalty to the district attorney, which they gave to the Defendant. He said that the Defendant refused to talk further about the location of the victim's body and that the Defendant said he wanted to talk to his lawyer. He said that the Defendant said he still wanted to talk to them the next day but that when they returned on May 26, the Defendant did not have a map for them. He said he later returned to the victim's home and found its condition consistent with the Defendant's account of cutting the screen and climbing in through the window.

Investigator Cook testified that while he and Agent Barham were at the victim's home on May 26, 2004, they received information that a female body had been found. He said they went to the scene, which was in a remote area near the pumping station and Normandy Lake, and saw a decomposing body covered with freshly cut branches and saplings.

Investigator Cook testified that he and Agent Barham talked to the Defendant on August 16, 2004, and that the Defendant denied killing the victim. He said the Defendant claimed that he and his wife met David Loffman at the pumping station and that he gave Mr. Loffman his gun because Mr. Loffman was going to pay him for it. He said the Defendant claimed that he returned to the pumping station on May 21 at 9:00 p.m. and that he met with Mr. Loffman, another man, and a woman with long, dark hair. He said that the Defendant stated that Mr. Loffman told him to return in an hour and a half and that the Defendant claimed he found a brown paper bag with the gun and $100 inside when he returned. He said the Defendant reported that he knew Mr. Loffman lived in a trailer across from the Defendant's father's church. He said the Defendant admitting knowing that the trailer had been the victim's but that the Defendant claimed to think the victim had died long ago. He said the Defendant reported that he decided to break into the trailer and steal the car because Mr. Loffman still owed him money. He said the Defendant claimed that he rode a bike from his father's house to the church, that he left the bike in a shower stall at the church, and that he entered the victim's home by cutting the window screen and climbing through the window. He said that the Defendant reported finding the victim's car keys on an end table and also finding the bag with the gun. He said the Defendant claimed he was scared by a noise from the back of the house and left. He said the Defendant identified David Loffman as his wife's boyfriend. Investigator Cook identified a photograph exhibit of the keys that were in the victim's wrecked car.

On cross-examination, Investigator Cook acknowledged that the Defendant admitted breaking into the victim's home through the window, taking her car, and spray painting the car. He admitted the Defendant talked to him voluntarily on August 16, 2004, even though the Defendant stated he wanted to speak to his lawyer on May 25. He said that in his opinion, the Defendant fabricated the story about meeting with someone and selling a gun for $100. He said that the Defendant told "bits and pieces of the truth" but that he did not believe the Defendant's statements overall. He admitted he did not investigate the parts of the Defendant's statements that he did not believe. He said that he thought the Defendant's claim about David Loffman referred to one of the victim's grandsons but that he did not believe the Defendant really knew the grandson's name.

Investigator Cook testified that a laboratory analysis was performed on a shell casing found near the victim's body and that the casing matched the handgun the Defendant had when he was arrested. He acknowledged that slugs of several other calibers were found near the body. He said an upper denture was also recovered in the area.

Special Agent Kendall Barham of the TBI testified that he went to the victim's house at least three times during the course of his investigation. He said there was a denture holder

and a set of lower dentures in the victim's bathroom. He said a set of upper dentures was found near the victim's body.

Agent Barham testified about the Defendant's statement on May 25, 2004. He said the Defendant admitted cutting a window screen at the victim's house and climbing inside the window. Agent Barham said the Defendant took the car keys from a coffee table and left through the front door. He said the Defendant admitting going to Murfreesboro in the victim's car, buying spray paint, painting the car, and going to an area near Tims Ford Lake. He said that when Investigator Cook mentioned giving the victim a decent burial, the Defendant became complacent and asked to have a cigarette before he told them what happened. He said the Defendant claimed that they would never find the victim and that he would have to draw them a map. He said the Defendant stated that he wanted to be sentenced to the death penalty. He said the Defendant would not identify the location of the victim's body and eventually requested an attorney, which ended the interview. Agent Barham said that he and Investigator Cook returned the next day to get the map the Defendant promised to draw but that the Defendant did not provide it.

Investigator Barham testified that Agent Cook's written summary of the Defendant's August 16 interview was accurate. He said that the interview took place while he was driving on the interstate and that he was not able to pay close attention or make notes.

On cross-examination, Investigator Barham testified that after the Defendant admitted cutting the window screen, he went to the victim's house and confirmed that the screen was cut. He said that he attempted to collect fingerprint evidence but that he was not able to get a print of sufficient quality for analysis. He said that he contacted the manager of the store where the Defendant claimed to have purchased spray paint, and that the manager told him he did not have a store video. He said that the manager told him he would contact him if he found a cash register receipt for the paint but that he never heard from the manager. He acknowledged that some of the Defendant's statements were true.

Christopher Harrell testified that he lived next door to the victim in May 2004 and that he assisted in the rescue squad's search for the victim near the pumping station. He said that a few days later, he went to look for the victim on his own. He said he was riding his four-wheeler in the Normandy Lake area and smelled an odor of decay. He said he looked for the source of the smell and found the victim's body covered by small tree limbs in woods near "briary grass." He said that he called his grandmother to report his findings, that she called the authorities, and that he went to the pumping station entrance to wait for their arrival. He denied touching the body or the ground near it. On cross-examination, Mr. Harrell admitted he never saw the Defendant near where he found the victim's body.

TBI Special Agent Sandra Poltorak testified that she was a forensic scientist supervisor and a member of the Violent Crime Response Team that processed the scene where the victim's body was found. She identified photographs taken by the team and a diagram she drew. She said the victim's body was not intact and appeared to have been damaged by animals and insects. She said they collected two cartridge casings, one of which was underneath the body. She said they also collected half of a set of dentures and clothing. She said that based upon her experience and the extent of the decomposition of the victim's body, it was her opinion that the victim was not killed the day she was found. She acknowledged that it was hot on May 26 and that decomposition accelerated at high temperatures.

On cross-examination, Agent Poltorak acknowledged that the beer cans the team collected did not have any identifiable fingerprints. She said that when she arrived at the scene, she was informed the body was female and that the team speculated that it was the victim. She said the leaves on the branches covering the victim's body were still green. She acknowledged that no hair, fibers, fingerprints, or DNA were collected at the scene that would link the Defendant to it.

Dr. John Patsimas testified that he was the victim's treating physician. He said that he saw her as a patient frequently, that they were very close, and that she "adopted" him as a grandson. He said that given her age, she was in good health. He could not recall whether she wore dentures. He identified x-ray films he took of her knee in 2000 that he said the medical examiner requested to assist in identification of her body.

Dr. Amy McMaster testified as an expert witness in forensic pathology. She performed the victim's autopsy on May 27, 2004. She said that the body was in an advanced state of decomposition and that there was skeletonization, or exposure of the bone. She said she requested Dr. Hugh Berryman, an anthropologist, to assist her. She said the body was identified as the victim based upon comparisons with existing x-rays of her knee.

Dr. McMaster testified that in her report, she listed the victim's date of death as May 26, 2004, because in Tennessee the legal date of death was determined by when a person is pronounced or found dead, rather than by the date the person actually died. She said that given the state of decomposition, the victim did not actually die on May 26. She said the manner of death was homicide and the cause of death was gunshot wounds. She said there were at least two gunshot wounds, one on the left side that injured the victim's left collarbone and left first rib, and one on the right side that injured the victim's right fifth rib and right shoulder blade. She said that the gunshot to the left side traveled from back to front and that the one on the right side traveled from front to back. She said that there were fractures of the bones of the spine and ribs but that she was unable to determine whether they

occurred before or after the victim's death. She said that it was likely that major organs were damaged by the gunshots and that if this happened, the victim would have been conscious for about thirty seconds and would have died in less than five minutes. She said the only clothing on the victim's body was a pajama-type top. She said that there were holes in the top but that she was unable to determine what caused them. She said, however, that the holes corresponded with the same areas of the victim's body as the gunshot wounds. She said that parts of the body could have become separated either from animal activity or decomposition of ligaments and tissue.

Dr. McMaster testified that in her opinion, the victim died on the earlier end of the five-day window between the victim's disappearance on May 21 and her recovery on May 26, 2004. She said that estimating the time of death is imprecise. She said that she would not expect to see the amount of decomposition and skeletonization present within a day or two of death and that it was more likely the victim died four or five days before her body was found.

On cross-examination, Dr. McMaster acknowledged that she was unaware of any DNA identification of the victim. She admitted the autopsy order listed the victim's name as the probable identification of the body. She acknowledged that she would have inquired about the last time the suspected victim was seen alive.

Special Agent Steve Scott of the TBI testified as an expert in ballistics. He said that in connection with this case, he examined a Taurus Model PT92 nine-millimeter handgun, cartridge cases, and fired bullets, which he identified as items in evidence. He said the unfired ammunition he received was consistent with the type that would be fired from the handgun. He said that based upon his examination, he determined that the two fired cartridge cases recovered from the crime scene were fired from the Taurus nine-millimeter handgun. He said that he also examined three nine-millimeter projectiles recovered from the scene and that it was possible one of them was fired from the handgun, although he could not say so conclusively.

The defense did not offer proof. The jury found the Defendant guilty of first degree premeditated murder, first degree felony murder, especially aggravated robbery, especially aggravated kidnapping, aggravated burglary, evading arrest, and unlawfully possessing a handgun. The trial court then conducted the sentencing phase of the trial for the murder convictions, in which the State sought the penalty of life without parole based upon aggravating factors that (1) the victim was more than seventy years old, and (2) the Defendant had one or more prior violent felony convictions.

The State introduced certified copies of judgments reflecting the Defendant's prior convictions for four counts of kidnapping, aggravated burglary, burglary, temporary taking of a motor vehicle, grand larceny, two counts of malicious mischief, concealing stolen property valued at less than $200, and felony escape.

Investigator Billy Cook testified that he was involved in the investigation of the Defendant's four prior kidnapping convictions. He said the crimes occurred on October 17, 1998, and involved the kidnapping of four teenage boys. He said his investigation revealed: The boys threw eggs at the Defendant's fence and mailbox and "rolled a yard" of someone else. After visiting in someone's home, the boys returned to the car in which they had been riding and found the Defendant standing next to it. The Defendant yelled at and slapped one of the boys and pushed his way into the back seat while holding a bag. The Defendant insisted that the boys take him into the country, despite the driver's protest. The driver eventually did so, and when they reached a lake, the Defendant pointed a gun at one of the boys and stated that he could kill them all. One of the boys said he was going to leave, but the Defendant told him, "You ain't going nowhere." The Defendant took the car keys. They were at the lake about forty-five minutes to an hour before the Defendant drove them around on back roads and insisted that they drink alcohol. The Defendant went to a house he said was his brother's and then took the boys to a tobacco field, where they stayed for about two hours. One of the boys said he wanted to go home and asked to drive, but the Defendant did not yield the keys. The boys ran to a house when the Defendant fell asleep or lost consciousness. On cross-examination, Investigator Cook acknowledged that the Defendant was convicted of the kidnapping charges based upon his guilty pleas, not a trial.

The defense called Becky Cook, the Defendant's sister, who testified that the Defendant did carpentry work when he was not in jail. She said he had a long-standing drug and alcohol problem. She said her family loved and supported him.

The jury found the existence of both aggravating factors and returned a verdict that the Defendant should be confined for life without parole. The jury also found that the Defendant had a prior felony conviction of kidnapping.

**I**

The Defendant contends that the evidence was insufficient to support his convictions of especially aggravated robbery, especially aggravated kidnapping, felony murder, and premeditated murder. He argues that the proof only shows that he stole the car, not that he robbed or kidnapped the victim. He also argues that premeditation was not shown. The State responds that the proof supports the convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The jury decides the weight to be given to circumstantial evidence and that "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marabel v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1611). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Genaro Dorantes, No. M2007-01918-SC-R11-CD, ___ S.W.3d ___, slip op. at 12 (Tenn. Jan. 25, 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id., ___ S.W.3d at ___, slip op. at 9-12 (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A.    Especially Aggravated Robbery

Especially aggravated robbery is "robbery . . . [a]ccomplished with a deadly weapon . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403 (2010). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id., § 39-13-401(a) (2010).

Viewed in the light most favorable to the State, the evidence reflects that the victim was cautious about her personal security and that she did not allow anyone to borrow her car. She kept her car keys in her purse. The Defendant admitted that he cut the window screen and crawled into the victim's house. The record reflects that the victim's purses where scattered about her bedroom and that she was killed by shots fired from the Defendant's gun. The Defendant was driving the victim's car and admitted spray painting it after taking it from her home. The victim's personal habits were such that there is no reasonable inference that she would have given the Defendant her car keys and allowed him to drive her car unless she was afraid of him or physically overcome by him. The circumstantial proof is sufficient to establish that after breaking into the victim's home, the Defendant took the victim's car keys

and car by force or by creating fear and that the victim suffered serious bodily injury when she was shot during the course of the robbery.

## B.      Especially Aggravated Kidnapping

Relevant to this case, especially aggravated kidnapping "is false imprisonment . . . [a]ccomplished with a deadly weapon . . . [or where] the victim suffers serious bodily injury." Id., § 39-13-305(a)(1), (4) (2010). "A person commits . . . false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id., § 39-13-302(a) (2010).

In addition to the evidence recited above, the record reflects that the victim's body was found with one denture plate, while the other remained in her home, and the only clothing with her body was a pajama top. Viewed in the light most favorable to the State, the evidence does not create any reasonable inference that the usually cautious victim would have voluntarily left her home while partially clothed and gone in her car to a remote area with a man who entered her home by cutting a screen and crawling through the window. There was no proof the victim was killed in her home, and the proof was consistent with her death occurring at the scene where her body was found. The evidence is sufficient to support the Defendant's conviction of especially aggravated kidnapping.

## C.      First Degree Felony Murder

Felony murder is a killing committed in the perpetration of certain felonies. Id., § 39-13-202(a)(2) (2003) (amended 2007). The Defendant was charged with first degree felony murder committed in the perpetration of kidnapping. As discussed above, the evidence was sufficient to support the Defendant's conviction of especially aggravated kidnapping. The proof also demonstrates that the victim died from gunshots inflicted with the Defendant's gun. The Defendant told the authorities they would never find the victim unless he drew them a map. The victim's body was found in a remote area that the Defendant was known to frequent. The evidence is sufficient to support the Defendant's felony murder conviction.

## D.      First Degree Premeditated Murder

The Defendant was also charged with premeditated murder. This offense required an unlawful, premeditated, and intentional killing. Id., § 39-13-202(a)(1) (2003) (amended 2007). "Premeditation" is defined as an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself.

> It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id., § 39-13-202(d). A jury is not limited to any specific evidence when determining whether a defendant intentionally killed the victim "after the exercise of reflection and judgment." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). Premeditation may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). "'Intentional' refers to a person who acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." T.C.A. § 39-11-106(a)(18) (2010).

The evidence demonstrates that the Defendant admitted planning to break into the victim's home, although he claimed he thought Mr. Loffman lived there and that he did so in order to settle a debt Mr. Loffman owed him. In order to complete his crimes, the Defendant rode a bicycle from his father's house to the church, left the bicycle in a shower stall, and broke into the victim's home nearby. The victim's home was absent of forensic evidence that the victim was killed there, which supports the inference that the Defendant forced her to go with him to a remote location several miles away, where he shot and killed her. There was circumstantial proof of the Defendant's motive for planning the victim's murder. Before the Defendant committed these crimes, he had outstanding warrants for other charges, and the police were actively searching for him. After these crimes, he expressed his desire to receive the death penalty because he did not want to spend the rest of his life in prison. He changed the appearance of the victim's car by spray painting it and fled from the police when they pursued him. He later admitted to them that the victim's body was in an obscure location that only he could identify by drawing a map. The evidence sufficiently supports that the Defendant was guilty of first degree premeditated murder because he acted with premeditation and intent in killing the victim.

## II

Next, the Defendant contends that the trial court erred in admitting evidence about the rate of decomposition of the victim's body. He argues that Agent Poltorak lacked proper qualifications to testify as an expert. The State contends that any complaint about the admission of the evidence is waived because the Defendant failed to raise a contemporaneous objection. We hold that the issue is waived and that the Defendant has not shown plain error.

Agent Poltorak testified about her observations at the scene where the victim's body was found. The State then questioned Agent Poltorak whether, based upon her experience investigating crime scenes with decomposing bodies, she thought the victim died the same day that her body was discovered. The Defendant did not object to the question, and Agent Poltorak answered that she did not think the victim died the same day. Agent Poltorak then testified without objection that the body was "very decomposed" and stated that decomposition increased in warm weather.

Because the Defendant did not raise any objection when the State elicited opinion testimony from Agent Poltorak, the trial court was not asked to rule whether the opinion testimony was proper, but only if the witness was qualified as an expert. Although the State offered some proof of Agent Poltorak's training and experience, it did not have the opportunity to do so in the context of qualifying her as an expert witness. As a general principle, relief is not available to "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a). Because the Defendant failed to make a contemporaneous objection to Agent Poltorak's expert qualifications to give opinion testimony, he has waived any complaint about the admission of the evidence. See Tenn. R. Evid. 103(a)(1).

This court may, however, in the interest of justice, recognize plain error in the record. See T.R.A.P. 36(b). Our supreme court has adopted five factors to consider when deciding whether an error constitutes plain error in the absence of an objection at trial:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In order for this court to reverse the judgment of a trial court, the error must be "of such great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

We conclude that plain error relief is not warranted. The Defendant has not established that a substantial right was adversely affected or that consideration of any error is necessary to do substantial justice. The record reflects that Agent Poltorak's testimony

-17-

was consistent with Dr. McMaster's expert testimony. Dr. McMaster testified in detail about the victim's time of death and state of decomposition. The Defendant is not entitled to relief.

**III**

The Defendant contends that he was deprived of due process and a fair trial by the admission of proof of the Defendant's pending rape charges. He argues that the trial court should have declared a mistrial, even though he did not request that the court declare a mistrial on this basis. The State contends that the Defendant has waived our consideration of the issue because he did not object in the trial court to the curative instruction given or request a mistrial. We hold that the Defendant has not shown any constitutional error requiring relief.

During Investigator Cook's direct examination, the State displayed on an overhead projector a written summary of the Defendant's May 25, 2004 interview with Investigator Cook and Agent Barham. This document was not received as an exhibit, but the record reflects that the document contained a reference to crimes alleged in the Defendant's arrest warrants that were outstanding before the present crimes. Defense counsel objected after the document was displayed, requested that the references to the prior crimes be redacted, and asked that a curative instruction be given. In his objection, defense counsel did not identify the specific warrants to which he objected, although his appellate brief refers to "a pending rape charge." Defense counsel acknowledged earlier proof that the Defendant was wanted for outstanding warrants but said he objected to the jury's knowing the specific nature of the crimes. The trial court proposed a curative instruction, to which the defense agreed. The court then instructed the jury that it should not consider the redacted lines on the statement and the specifics of why the Defendant was wanted relative to other matters. The defense did not object to this instruction or request a mistrial.

"If a party fails to request a curative instruction, or, if dissatisfied with the instruction given and does not request a more complete instruction, the party effectively waives the issue for appellate purposes." State v. Griffis, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997); see State v. H.R. Hester, No. E2006-01904-SC-DDT-DD, McMinn County, — S.W.3d —, — (Tenn. Oct. 5, 2010) (appendix) (quoting Griffis). In addition, a defendant who fails to request a mistrial waives any further action by the trial court. State v. Hall, 976 S.W.2d 121, 157 (Tenn. 1998) (appendix). Because the Defendant approved the curative instruction given and did not request a mistrial, any complaint about the instruction or the trial court's failure to declare a mistrial is waived. See T.R.A.P. 36(a).

We have considered whether the Defendant is entitled to plain error relief. The record does not clearly establish what occurred in the trial court because the document about which

the Defendant complains is not part of the record. In addition, the Defendant has not shown that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, or that consideration of any error is necessary to do substantial justice. Plain error relief is not warranted.

**IV**

The Defendant contends that the trial court erred in failing to give an alibi instruction. The State responds that the Defendant waived the issue by failing to request the instruction, not responding to the State's pre-trial demand for notice of alibi, and failing to present an alibi defense. Alternatively, the State argues that the instruction was not required because the trial evidence did not require it. We hold that the evidence did not require an alibi instruction.

When the issue of an alibi is raised and supported by credible evidence at trial, the trial court must give the jury an instruction on the alibi defense, whether requested or not. Christian v. State, 555 S.W.2d 863, 864 (Tenn. 1977). Our courts have held that a trial court's failure to give an alibi charge, when the defendant is entitled to one, impacts the fundamental fairness of the trial and constitutes reversible error. See, e.g., Manning v. State, 500 S.W.2d 913, 915 (Tenn. 1973). However, "the evidence must first fairly raise the defense of alibi before [an appellate court] will reverse for failure to charge." Id. (emphasis in original). We conclude that the Defendant's failure to request the instruction did not waive his right to the instruction if the proof required it.

"Alibi" is defined as "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." Black's Law Dictionary 72 (7th ed. 1999). Traditionally, alibi evidence revolves around the location of the defendant at the time the crime was committed. This is apparent from the Tennessee Rules of Criminal Procedure's requirements of a defendant's notice of alibi. In response to the state's request of notice of alibi defense, a defendant seeking to offer an alibi defense must provide the state with the written notice of "the specific place or places at which the defendant claims to have been at the time of the alleged offense" and "the name and address of each alibi witness on whom the defendant intends to rely." Tenn. R. Crim. P. 12.1(2)(A).

The Defendant argues that an alibi defense was fairly raised by the proof that he was in custody after his arrest on May 24, 2004, and unable to commit the crimes because the State's expert, Dr. McMaster, could not say with certainty that the victim died before the Defendant was arrested. The State notes that despite Dr. McMaster's inability to assign a precise time of death, she stated her expert opinion that it was very unlikely the victim was

-19-

killed after the Defendant was in custody. The State also notes the additional proof that the Defendant was known to have been driving the victim's car after the victim's disappearance, that the Defendant was arrested in possession of the same gun that fired the bullets used to kill the victim, that the gun could not have been used to kill the victim after the Defendant's arrest because the gun was in police custody, and that the Defendant admitted knowing where the victim's body was and requested the death penalty for his actions.

Upon review, we hold that the trial court had no obligation to give an alibi instruction. The proof did not fairly raise the defense. The evidence reflects that any possibility the victim was killed after the Defendant's arrest using a gun that was in police custody was entirely improbable, particularly given the additional proof that the Defendant possessed the victim's car shortly after her disappearance and near her estimated time of death. The Defendant is not entitled to relief.

## V

The Defendant contends that the trial court erred at the sentencing hearing by admitting underlying factual proof about the Defendant's prior kidnapping convictions, rather than limiting the proof to the existence of the convictions in order to establish the prior violent felony aggravator. The State counters that any error was harmless because the Defendant conceded that he had one prior felony involving violence to the person and the proof established that the victim was seventy years old or older. See T.C.A. § 39-13-204(i)(2), (14) (2003) (amended 2008, 2009, 2010). We hold that the trial court should not have allowed the State to introduce proof to the jury about the underlying facts of the prior convictions but that the error was harmless.

The possible sentences for first degree murder are life, life without parole, and the death penalty. T.C.A. § 39-13-204(a). After a verdict of guilt is returned, the jury must consider the appropriate sentence in a separate sentencing hearing. Id. A sentence of life without parole may be fixed if the jury finds beyond a reasonable doubt that one or more statutory aggravating factors exist. Id., § 39-13-204(e), (f). In determining the proper sentence, the jury is required to weigh and consider any aggravating factors proven beyond a reasonable doubt by the State and any mitigating circumstances. Id., § 39-13-204(f)(2).

Code section 39-13-204(c) permits evidence at a sentencing hearing "as to any matter that the court deems relevant to the punishment . . . including . . . any evidence tending to establish or rebut the aggravating circumstances listed in subsection (i)." T.C.A. § 39-13-204(c). The statute provides that if the State relies on the prior violent felony aggravator, "either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction." Id. The statute provides wide latitude in admissibility. "Such

evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground the probative value of the evidence is outweighed by prejudice to either party." Id.

Our supreme court has said that in cases involving a prior felony that may be established by various modes, either involving or excluding violence to the person, the trial court should examine the facts, the record, and the evidence underlying the prior conviction to determine upon which statutory elements the conviction was based. State v. Sims, 45 S.W.3d 1, 11 (Tenn. 2001). The question of whether the statutory elements of the prior felony of which a particular defendant was convicted involved violence to the person is one of law for the court. Id. Questions of fact for the jury remain, however, as to whether the State has established the prior violent felony aggravating circumstance beyond a reasonable doubt and whether the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. State v. Cole, 155 S.W.23d 885, 904 (Tenn. 2005).

The United States Supreme Court has said that in discharging its duty of determining whether a defendant was convicted of a prior felony involving violence, a trial court must limit its consideration in a case involving a prior conviction based upon a guilty plea to "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Shepard v. United States, 544 U.S. 13, 16 (2005); see State v. Ivy, 188 S.W.3d 132, 151 (Tenn. 2006); State v. Rice, 184 S.W.3d 646, 668-69 (Tenn. 2006). Shepard involved the use of police reports to determine the specific character of a prior conviction, and the court held that such documents were out of reach of the trial court's consideration in this regard. See Shepard, 544 U.S. at 21-25. However, our supreme court has noted the distinction between proof the trial court may rely upon in determining whether a prior conviction involved a statutory element of violence, which is limited by Shepard, and the proof the jury may rely upon in determining whether the prior violent felony aggravating circumstance has been proven beyond a reasonable doubt, which includes proof about the facts underlying the prior violent felonies pursuant to Code section 39-13-204(c). See State v. Young, 196 S.W.3d 85, 115 (Tenn. 1996).

In the present case, the trial court conducted a hearing outside the presence of the jury at which Investigator Cook testified that he was the investigating officer and read portions of a police report that contained the victims' detailed statements about the underlying facts of the prior kidnapping convictions. The trial court relied on this evidence in ruling that the Defendant's prior kidnapping convictions involved the element of violence as contemplated by the (i)(2) aggravating circumstance. Under Shepard, the use of the victims' statements from the police report to prove that the elements of the prior felonies involved violence was error. See id. The State's proof at the in camera hearing did not include the indictment, the

-21-

written plea agreement, the transcript of the plea hearing, or any findings of the trial judge to which the Defendant agreed, as limited by Shepard. Given the absence of Shepard-qualified proof, the trial court erred in allowing the State to present this same proof to the jury and in allowing the jury to consider whether the State had proven the prior violent felony aggravator beyond a reasonable doubt.

The question remains whether the Defendant was prejudiced by the error. See State v. Harris, 989 S.W.2d 307, 316 (Tenn. 1999) (holding that erroneous application of an aggravating factor to support a sentence of life without parole was a statutory, not a constitutional, error). The Defendant argues that the proof of his prior violent felonies should not have been submitted to the jury and that the jury's reliance on the prior violent felonies as one of two aggravating factors to support a life without parole sentence "[o]bviously . . . negatively affected the outcome of the case." The State argues that the error was harmless because (1) the record reflects an additional prior violent felony in addition to the kidnapping convictions, and (2) there was undisputed proof that the victim's age was seventy or older.

We reject the State's harmless error argument based on the fact that there was proof that the Defendant had a prior violent felony conviction in addition to the four kidnapping convictions. Only the Defendant's prior kidnapping convictions were submitted as proof of the prior violent felony aggravating circumstance. See T.C.A. § 39-13-202(i)(2). The State submitted proof of the Defendant's other felony convictions for general consideration under Code section 39-13-204, as proof of "any matter . . . relevant to the punishment, [including] . . . the defendant's character [and] background history." See T.C.A. § 39-13-204(c). Thus, any proof of other convictions was not available to be considered for purposes of establishing the (i)(2) prior violent felony aggravating circumstance. That said, however, the Defendant's criminal history, including evidence of the existence of the kidnapping convictions, aside from the evidence of their violent character, was admissible under Code section 39-13-204(c) as evidence of the Defendant's character and background history. Our evaluation of the effect of the trial court's error in allowing the jury to consider the (i)(2) prior violent felony aggravator necessarily takes into account the admissibility of the Defendant's criminal history.

As noted by the State, the record contains undisputed proof that the victim was ninety-two years old. The jury found that the (i)(14) aggravating circumstance existed beyond a reasonable doubt. The Defendant does not contest the factual basis for the (i)(14) aggravator.

Upon consideration, we hold that the erroneous admission of underlying factual proof of the prior violent felonies was harmless. The Defendant was a fugitive who broke into the elderly victim's home, stole her car, kidnapped her, took her to a remote area, and shot her.

He had an extensive criminal history. We conclude from the record that even had the jury determined that only the (i)(14) age aggravator was shown beyond a reasonable doubt, the jury nevertheless would have found that this aggravating factor outweighed the weak mitigating proof beyond a reasonable doubt and would have sentenced the Defendant to life without parole. The Defendant is not entitled to relief.

## VI

The Defendant contends that his right to be protected from double jeopardy was violated when the trial court entered judgments for both first degree felony murder and first degree premeditated murder, and then merged the convictions by subsequent order. The State contends that the trial court properly merged the dual murder convictions and that the Defendant was not subjected to double jeopardy by the separate judgments. The State notes that amended judgments are proper in this situation but that the record does not reflect whether amended judgments were entered. We hold that the trial court erred in entering two convictions, and we remand the case for entry of a modified judgment reflecting merger of the two first degree murder convictions.

Our supreme court has directed that when a defendant is charged with both premeditated and felony murder, the trial court should instruct the jury to render a verdict on both theories of first degree murder. State v. Howard, 30 S.W.3d 271, 275 (Tenn. 2000). Yet, "when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction of first degree murder." State v. Cribbs, 967 S.W.2d 773, 788 (Tenn. 1998). When a defendant is convicted of both first degree felony murder and first degree premeditated murder of the same person, the trial court should merge the jury's verdicts of guilt on both premeditated and felony murder into a single judgment of conviction. See Howard, 30 S.W.3d at 275; State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). The merger avoids a double jeopardy problem while protecting the jury's findings. Howard, 30 S.W.3d at 275.

The Defendant in this case was charged with two counts of murder of the same person. Although the Defendant argues that the judgments should be "set aside," the trial court's erroneous entry of two judgments does not prevent this court from vacating those judgments and ordering the trial court to enter one judgment of conviction of first degree murder reflecting merger of the two convictions. See, e.g., State v. Timmy Reagan, No. M2002-01472-CCA-R3-CD, Overton County, slip op. at 20 (Tenn. Crim. App. Sept. 17, 2003) (modifying and remanding case involving two judgments arising from a single first degree murder offense for entry of a single first degree murder judgment noting merger of the two convictions), app. denied (Tenn. May 19, 2004). We vacate the judgments of the

trial court regarding count four, the felony murder conviction, and count five, the premeditated murder conviction, and direct the trial court to enter a single judgment of conviction for first degree murder.

## VII

In his last issue, the Defendant contends he was deprived of the effective assistance of counsel when trial counsel failed to call two exculpatory witnesses to testify at the trial. The State contends that the Defendant did not raise the issue in the trial court as one of ineffective assistance of counsel and that the Defendant failed to prove his due process claim relative to these witnesses at the motion for new trial.

This court has been reluctant to address claims of ineffective assistance of counsel raised on direct appeal, instead of in post-conviction proceedings. See, e.g., Thompson v. State, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997); State v. Anderson, 835 S.W.2d 600, 606-07 (Tenn. Crim. App. 1992). Nevertheless, there is no prohibition against litigation of ineffective assistance of counsel claims in conviction, as opposed to collateral, proceedings. See, e.g., State v. Burns, 6 S.W.3d 453, 461-63 (Tenn. 1999) (granting relief in direct appeal on ineffective assistance of counsel claim).

The record reflects that the Defendant filed numerous pro se motions in the trial court even though he was represented by appointed counsel. He filed a pro se, pretrial motion in which he sought an "Order Directing Counsel To Invoke Compulsory Process" requiring defense counsel to subpoena twelve witnesses, including Iris Crofoot and Barbara Lewter, to testify on his behalf. He alleged that trial counsel refused to subpoena the witnesses and that he was entitled to an order directing counsel to subpoena the witnesses pursuant to the Confrontation Clause rights of the Sixth Amendment and Article I, section 9 of the Tennessee Constitution. After the trial, the trial court granted trial counsel's motion to withdraw and appointed substitute trial counsel, who filed an amended motion for new trial alleging that trial counsel's failure to call Ms. Crofoot and Ms. Lewter was a due process violation requiring a new trial. The Defendant offered no proof at the hearing on the motion for new trial, and the trial court made no findings with respect to the issue and did not address the claim other than by stating, "Any other grounds for a new trial as cited by the defendant in his many motions are hereby overruled."

We conclude that the Defendant did not raise the issue in the trial court as one of ineffective assistance of counsel. On direct appeal, our review is limited to issues that were specifically stated in a motion for new trial. T.R.A.P. 3(e). Because the issue was not raised in the motion for new trial, our consideration of it is waived. See id.; id. 36(a) (providing

that "relief may not be granted in contravention of the province of the trier of fact").  We conclude that the merits of the issue are waived for the purposes of this direct appeal.

In consideration of the foregoing and the record as a whole, the judgments of the trial court for especially aggravated robbery, especially aggravated kidnapping, aggravated burglary, evading arrest, and being a felon in possession of a handgun are affirmed.  The judgments of conviction for first degree felony murder and first degree premeditated murder are vacated.  The case is remanded to the trial court for entry of a single judgment of conviction for first degree murder that reflects merger of counts four and five.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE